T.C. Memo. 1998-50


UNITED STATES TAX COURT


ESTATE OF EDNA PEARCE LOCKETT, DECEASED, DAVID F. LANIER,
PERSONAL REPRESENTATIVE, Petitioner <u>v</u>. COMMISSIONER
OF INTERNAL REVENUE, Respondent


Docket No. 6551-95.                    Filed February 9, 1998.


<u>Merritt A. Gardner</u>, for petitioner.

<u>William R. McCants</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

BEGHE, <u>Judge</u>:  Respondent determined a deficiency of

$1,523,796 in petitioner's Federal estate tax.  After

concessions, the issues for decision are:  (1) Whether a transfer

of real property by petitioner qualifies for the charitable

deduction under section 2055(a);[1] and (2) whether expenses paid by petitioner in the operation of decedent's cattle ranch are deductible under section 2053 as administration expenses. We hold that petitioner's transfer does not qualify for the charitable deduction and that the expenses of operation of the cattle ranch are deductible as administration expenses.

## FINDINGS OF FACT

Some of the facts have been stipulated and are incorporated herein by this reference.

Edna Pearce Lockett (decedent) died testate on May 17, 1991, and was a resident of Florida at the time of her death. David Lanier (Mr. Lanier), the personal representative of decedent's estate, resided and practiced law in Florida at the time of filing the petition.

Decedent died without issue, survived by her nephew Leland Pearce (Mr. Pearce) and by three nieces, Ruth Pearce Fulton, Patricia Pearce Durrance, and Clara Evelyn Pearce Johnson. During her lifetime, decedent served in the Florida Legislature and owned and managed a cattle ranch.

## 1. The Estate

In February 1992, petitioner filed a Federal estate tax return, reporting a gross estate of $9,297,421. The bulk of

---

[1] All section references are to the Internal Revenue Code as in effect as of the date of decedent's death, and all Rule references are to the Tax Court Rules of Practice and Procedure.

decedent's estate consisted of two parcels of land named Fort Basinger (Basinger) and Fishbranch, the improvements on the two parcels, and the cattle and other assets of a cattle ranch located and operated primarily at Fishbranch. All the estate's real property is located in south central Florida, in Highlands County.

During most of her life, decedent lived on Basinger, a parcel of land located along the Kissimmee River near U.S. Highway 98. Basinger takes its name from an encampment that was used by General Zachary Taylor as his base of operations in the Seminole Indian wars during the early 19th century. The parcel consists of approximately 1,160 acres and includes the decedent's 120-year-old residence, a family cemetery, a one-room school house, an Indian burial mound, and other structures and sites. Decedent regarded the structures at Basinger as imbued with rich historical significance.

For decades decedent had operated a cattle ranch on Fishbranch, a parcel of approximately 7,741 acres, located south of Lake Istokpoga, approximately 20 miles from Basinger. The cattle ranch was a breeding operation that produced calves for sale to feed lot operators. Decedent was a strong-minded woman, who rode the range with the cowhands, and was accustomed to taking charge and doing things her own way. Decedent managed and directed the operations of the ranch until 1986 when she became physically and mentally incapacitated.

2.    <u>The Will and Amended Revocable Trust</u>

The disposition of decedent's property upon her death was governed by her Last Will and Testament (Will), dated August 3, 1983, and by her Amended Revocable Trust Agreement (Trust Agreement), dated June 3, 1985, providing for the Edna Pearce Lockett Revocable Trust (Trust).

After providing small pecuniary bequests to decedent's former employees and disposing of all clothes, jewelry, books, and other personal effects to her surviving nephew and nieces, the Will devised[2] the residuary estate to the trustees of the Trust.  Mr. Lanier, a longtime friend and attorney of the decedent, is named as the personal representative of the estate. The Will directs the personal representative to pay all estate taxes and expenses of administration out of the residuary estate. The Will and Trust constitute an integrated plan for the disposition of decedent's assets through the "pour over" of assets from the probate estate to the Trust.

The Trust Agreement recites that decedent is the grantor of the Trust and designates decedent, Mr. Lanier and Mr. Pearce as cotrustees.  The Trust, established under the laws of Florida, provides, in pertinent part, as follows:

ARTICLE III - Dispositive Provisions

---

[2] The Florida Probate Code uses "devise" to describe the transfer at death of both personal property and real property. Fla. Stat. Ann. sec. 731.201(8) (West 1995).

The Trustee shall hold, manage, invest and reinvest the trust property (including any amounts which may be added thereto under the Last Will and Testament of the "Grantor"[)] and shall collect the income thereof and dispose of the net income and principal as follows:

     *      *      *      *      *      *      *

B. Upon the death of the Grantor:

(a) The Grantor's home shall, insofar as possible, be set aside by the Trustees as a historical site. The designation of this site and management shall be in the discretion of the Trustees.[3]

(b) The Trustees shall divide the remaining balance of principal and income of the "EDNA PEARCE LOCKETT REVOCABLE TRUST" as then constituted into four (4) equal shares for the following named beneficiaries:

    I. Ruth Pearce Fulton
   II. Patricia Pearce Durrance
  III. Clara Evelyn Pearce Johnson
   IV. Leland C. Pearce

or their lineal descendants.

Each such trust fund shall be held by the Trustee as a separate trust fund, and each fund shall be designated by the names of the beneficiaries, or by the name of the lineal descendants, as the case may be. * * *

     *      *      *      *      *      *      *

During the lifetime of the beneficiary, the Trustee may distribute all or any part of the income of the trust hereinabove established to or for the benefit of the said beneficiary and the children of the said beneficiary, in such amounts, at such times, in such manner, and in such proportions * * * as the Trustees shall in their discretion deem advisable for the

---

[3] The language in subsection (a) of Article III B. is hereinafter referred to as the "Historic Site Language".

health, education * * * and support in reasonable comfort of the said beneficiary and the children of the beneficiary. * * *

* * * * * * *

In addition to the income payments provided in paragraph above, the Trustees may distribute all or any of the principal of the Trust hereinabove created to or for the benefit of the said beneficiary and the children of the said beneficiary, in such amounts, at such times, in such manner, and in such proportions, * * * as the Trustees shall in their discretion deem advisable for the health, education * * * and support in reasonable comfort of the said beneficiary and the children of the beneficiary. * * *

* * * * * * *

C. The trust shall terminate upon the twentieth anniversary of the death of the Grantor. * * *

Mrs. Lockett composed the Historic Site Language and directed Mr. Lanier to include it in the Trust Agreement. Mrs. Lockett also discussed her intentions with respect to the Historic Site Language with Mr. Lanier.

3. Disposition of Estate Property

Prior to the death of decedent, the Trust owned a portion of Basinger, Fishbranch in its entirety, and the cattle ranch located at Fishbranch, including livestock, equipment, and vehicles used in the business. After decedent's death, pursuant to the pour over provision of the Will, the Trust became the owner of the entire Basinger tract.

At decedent's death, the cattle business was encumbered by mortgage indebtedness of approximately $200,000. Shortly thereafter, petitioner was faced with Federal estate tax

liabilities in the amount of $3,402,530, and State estate tax liabilities in the amount of $888,356. At the time of decedent's death, the petitioner and Trust had only approximately $10,000 of liquid assets and approximately $68,000 in the form of a tax claim for a refund for the 1988 and 1989 tax years, available to meet the above liabilities. Consequently, Messrs. Lanier and Pearce decided it was necessary to sell the land and cattle held by the Trust in order to pay the debts of the estate, including the death tax liabilities, as well the mortgage debt on the cattle operation. In a meeting following decedent's funeral, the beneficiaries of the Trust expressed their agreement with the trustees' decision to sell.

F. Elgin Bayless (Mr. Bayless), a real estate appraiser, was hired to appraise the personal and real property included in petitioner's Federal estate tax return. Messrs. Lanier and Pearce refrained from marketing the estate property while they awaited the appraisal report for pricing guidance. On December 10, 1991, Mr. Bayless delivered his appraisal report. The report indicated that the Fishbranch parcel was landlocked and that the estate had no legal access to the property. Since the 1960's, decedent had used the roads along the Kissimmee canal, which were owned by the South Florida Water Management District (Water District), to travel back and forth between Fishbranch and Basinger. Decedent had never obtained a permit to

use these roads. The landlocked condition of the Fishbranch parcel impeded the trustees' efforts to sell it.

a.   Part Gift/Part Sale of Basinger

Soon after decedent's death, Messrs. Pearce and Lanier discussed their options as to how to handle the Basinger tract. Early in 1992, the Water District approached Messrs. Lanier and Pearce and proposed that the Trust donate the entire Basinger parcel to the Water District. The trustees concluded that the beneficiaries of the Trust would not want to donate so much land. Instead, Messrs. Lanier and Pearce entered into a contract with the Water District in their capacity as trustees of the Trust, pursuant to which they donated a portion of Basinger and sold the remaining portion of Basinger to the Water District (Gift/Sale Transaction). Approximately 615 acres were sold to the Water District for a price of $1,077,000, and approximately 468 acres were donated to the Water District.[4] The donated portion included the Lockett family residence, and the other historical sites. As part of the Gift/Sale Transaction, Messrs. Lanier and

_____

[4] Respondent argues that the 468 acres included 44 acres of land that were only quitclaimed to the Water District, since the petitioner did not have clear title to those acres. Because we disallow the charitable deduction claimed by petitioner for the transfer to the Water District, we need not decide whether these 44 acres were part of the transferred parcel, nor need we value the transferred parcel or make findings of fact related thereto resolving Basinger's exact acreage.

Messrs. Lanier and Pearce intended to dispose of Basinger in its entirety. But because surveyors overlooked a tract of approximately 40 acres, the Trust owned approximately 40 acres of Basinger at the time of trial.

Pearce obtained temporary access rights to the canal roads that allowed entry into Fishbranch.

On April 7, 1993, the Circuit Court of Highlands County, sitting as the probate court with jurisdiction over petitioner, held a hearing on the proposed Gift/Sale Transaction. The Court approved the transaction, on the condition that the Water District commit in writing to transfer the Lockett residence and other historical sites at Basinger to a Florida agency that would preserve the sites and keep them open to the public. William Malone (Mr. Malone), an employee of the Water District, who testified at trial, subsequently wrote a letter of assurance to the presiding judge, stating that the Water District would work with the appropriate government agencies to assure the preservation of the Lockett home as a historic site. On August 27, 1993, the Gift/Sale Transaction between the petitioner and the Water District closed. At the time of trial, the Water District was in the process of entering into an agreement, whereby it would lease portions of Basinger to Highlands County. Highlands County intends to establish an agricultural museum on the Lockett family residence and surrounding property.

b. The Sale of Fishbranch

In August 1994, petitioner entered into negotiations to sell Fishbranch to Willowbrook Coal Co. (Willowbrook). On April 27, 1995, a portion of Fishbranch, amounting to approximately 3,300 acres, was sold to Willowbrook in a cash sale for a price of

$2,802,110.  Willowbrook had also contracted to purchase the remaining portion of Fishbranch, but the contract was terminated in April 1996, because Willowbrook had been unable to obtain permanent access rights to that portion.

Shortly after the sale of the first portion of Fishbranch, the cattle, equipment, and vehicles used in the cattle business were sold.  The remaining portion of Fishbranch was finally sold on January 31, 1997, to O.L. Daniel for a sale price of $2,700,000.  The price paid by O.L. Daniel was approximately $150 less per acre than the price paid by Willowbrook, reflecting the deterioration in the quality of the land following the removal of the cattle.

4.  Operation of the Cattle Ranch

In 1986, after decedent had become incapacitated, Messrs. Lanier and Pearce took over the operation of the cattle ranch in their capacities as cotrustees of the Trust.  Mr. Pearce, who has been in the cattle business all his life, undertook the responsibility of providing overall direction of the cattle ranch and of providing guidance to a resident manager in the day-to-day operations.  Mr. Lanier handled the legal and financial matters relating to the business.  From May 17, 1991, the date of decedent's death, until April 30, 1996, Messrs. Lanier and Pearce continued to operate the cattle ranch.  During that period, petitioner incurred and paid $2,009,040 in expenses relating to the operation of the cattle ranch.

Messrs. Lanier and Pearce consulted 10 experts concerning the most prudent method for selling Fishbranch and the ranch assets.  All the experts advised that cattle should continue to graze on the land until it was sold.  If not maintained by cattle grazing, land in the part of Florida in which the Basinger and Fishbranch tracts are located quickly reverts to its native state and deteriorates into overgrown muck and swamp, decreasing its value and making it more difficult to sell.

On the Federal estate tax return, timely filed on February 17, 1992, petitioner listed $257,654 as expenses relating to the operation of the cattle ranch, and deducted that amount as expenses of administration of the estate.  Petitioner also noted on the return that additional cattle ranch expenses would be deducted as incurred, on supplemental filings of the Federal estate tax return.

Petitioner elected to pay Federal estate tax in installments, as provided by section 6166.  Under the election, the first payment was due on February 17, 1997, 5 years after February 17, 1992, the date the estate tax return was due.

On February 3, 1995, respondent issued a notice of deficiency to petitioner.  Petitioner's petition, timely filed on May 1, 1995, alleges, among other things, that expenses relating to the operation of the cattle ranch are administration expenses properly deductible from the gross estate in determining petitioner's estate tax liability.  Petitioner's Second Amended

Petition, filed on October 6, 1995, alleges for the first time that the trustees' transfer to the Water District of portions of Basinger without consideration constitutes a charitable transfer that is eligible for an estate tax deduction. As of the time of trial, there had not been any final accounting by Mr. Lanier before the Circuit Court of Highlands County, Florida, regarding the probate administration of the estate, nor have Messrs. Lanier and Pearce accounted for the administration of the Trust during this period.

OPINION

1. Estate Tax Deduction for Charitable Transfer

In determining the value of the taxable estate under section 2051, section 2055(a) allows a deduction from the gross estate of the value of all "bequests, legacies, devises, or transfers" of property to, or for the use of, a wide range of charitable, religious, and educational organizations. However, it does not necessarily follow that the estate will automatically be entitled to a deduction under section 2055 simply because property originally included in the gross estate is transferred by the estate fiduciaries to a qualifying organization during the period of estate administration. See, e.g., Estate of Marine v. Commissioner, 97 T.C. 368 (1991), affd. 990 F.2d 136 (4th Cir. 1993); Estate of Pickard v. Commissioner, 60 T.C. 618 (1973), affd. without published opinion 503 F.2d 1404 (6th Cir. 1974). A recurring problem is whether the decedent directed the transfer

to a qualifying organization or whether the estate fiduciary made the transfer in the exercise of his discretion; only in the former case is a deduction generally allowed. See Estate of Pickard v. Commissioner, supra at 622 ("the fact that the designated portion of decedent's estate inevitably inured to the benefit of the charity did not save the day").

The Estate Tax Regulations provide guidance in this area:

> (a) Remainders and similar interests. If a trust is created or property is transferred for both a charitable and a private purpose, deduction may be taken of the value of the charitable beneficial interest only insofar as that interest is presently ascertainable, and hence severable from the noncharitable interest. * * *
>
> (b) Transfers subject to a condition or a power. (1) If, as of the date of a decedent's death, a transfer for charitable purposes is dependent upon the performance of some act or the happening of a precedent event in order that it might become effective, no deduction is allowable unless the possibility that the charitable transfer will not become effective is so remote as to be negligible. * * * [Sec. 20.2055-2(a) and (b), Estate Tax Regs.]

These two requirements, the "presently ascertainable" and "remote possibility" requirements, were approved by the Supreme Court in Commissioner v. Estate of Sternberger, 348 U.S. 187 (1955) (expressly approving a prior version of these regulations) and by the Court of Appeals of the Fifth Circuit in Florida Bank v. United States, 443 F.2d 467, 471 (5th Cir. 1971) (concluding that the section 20.2055-2, Estate Tax Regs., appropriately implements section 2055). The Court of Appeals for the Eleventh Circuit, to which an appeal in this case would lie, deems itself bound by

decisions of the Court of Appeals for the Fifth Circuit issued prior to October 1, 1981.  Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981).

In Florida Bank v. United States, supra, the decedent's will directed the trustee to pay the widow $175 per month, pay an annual $500 scholarship, and divide the balance of remaining income, by reason of capital gains or otherwise, into three equal portions for his children for as long as they should live, with the remainder going to charity.  The Court held that the estate was not entitled to a section 2055 deduction because there was no way to determine whether the charitable beneficiaries would receive their bequest, nor what amount it would be if they were to receive it.  The amount of the charitable remainder was not ascertainable because the trustee had the discretion to buy and sell securities and distribute the capital gains to the decedent's children.  The trustee could purchase securities, sell them at a profit, and then distribute the capital gains to the life beneficiaries.  If the securities in which the trustee reinvested the principal declined in value, the corpus could be largely invaded.

The Court indicated that the trustee's discretion to invade the corpus by that means was not subject to a readily ascertainable standard that would preserve the deductibility of the charitable bequest.  Id. at 468-471; see also Merchants Natl. Bank v. Commissioner, 320 U.S. 256 (1943).  The Court

distinguished cases in which the trustee's discretion was restricted by an objectively measurable standard. In such cases, the charitable bequest may be currently ascertainable and the possibility that the transfer will not become effective may be so remote as to be negligible. See, e.g., Henslee v. Union Planters Natl. Bank, 335 U.S. 595 (1949); Ithaca Trust Co. v. United States, 279 U.S. 151 (1929).

Where a trustee or other fiduciary is given unrestricted discretion to transfer property to noncharitable beneficiaries, an eventual transfer of such property to charity does not meet the requirements of the regulations and therefore is not entitled to a charitable deduction. Where a trustee can divert funds or property to a noncharitable beneficiary, it is generally impossible to "presently ascertain" the value of the charitable bequest at the date of decedent's death, because there might not be a charitable bequest at all. Similarly, affording discretion of that sort to a trustee renders more than remote the possibility that decedent's intention to make a charitable transfer will not become effective.

In Estate of Taylor v. Commissioner, 40 B.T.A. 375 (1939), the trustees were given discretion that enabled them to decide between making a transfer to a charitable entity or a noncharitable entity. In her will, the decedent bequeathed $3,000 to her trustees in trust, for the purpose of establishing a memorial to her parents, and an additional $3,000 for a similar

memorial to her late husband.  The trustees eventually paid $6,000 to Grace Church, an entity operated exclusively for religious purposes, and claimed a deduction for a charitable bequest under section 303(a)(3) of the Revenue Act of 1926, ch. 27, 44 Stat. 72, a predecessor of section 2055.  In disallowing the deduction, the Board of Tax Appeals said:

> There is nothing in the will which restricts the trustees in their use of the bequest as to the nature, kind or type of "memorial" which they are to establish for either the decedent's parents or her husband.  The word "memorial" does not itself connote any limitation within the language of the statute.  It means only something to perpetuate a memory.  Conceivably and reasonably a memorial might have been adequately and satisfactorily established without any religious, charitable, scientific, literary, or educational purpose.  It happens that the trustees, in their discretion, contributed the legacies to a religious organization; but this was not by virtue of any limiting mandate of the will. Mississippi Valley Trust Co. v. Commissioner, 72 Fed. (2d) 197 [8th Cir. 1934], affirming 28 B. T. A. 387.  * * *  [Estate of Taylor v. Commissioner, 40 B.T.A. at 376.]

Paris v. United States, 381 F. Supp. 597 (N.D. Ohio 1974), quoted the above excerpt from Estate of Taylor v. Commissioner, supra, and then applied the rule it states to deny a charitable deduction for a memorial bequest.  Even though the executor used the funds earmarked for a memorial to establish an educational scholarship fund for religious students, the lack of directions and restrictions limiting the executor's discretion in carrying out the terms of the bequest to a religious, charitable, literary, scientific, or educational institution was dispositive in the Court's decision to disallow the deduction.

In the present case, decedent's instructions, as stated in the Trust Agreement, together with her intentions expressed to Mr. Lanier at the time the Historic Site Language was drafted, provided the trustees with wide discretion as to how to handle the setting aside of her home as a historical site.  The Historic Site Language states:

> B.  Upon the death of the Grantor:
>
>     (a)  The Grantor's home shall, insofar as possible, be set aside by the Trustees as a historical site.  The designation of this site and management shall be in the discretion of the Trustees.

We do not read the Historic Site Language as directing or even appearing to contemplate a transfer of the grantor's home outside the Trust.  Only when the language is juxtaposed with Mr. Lanier's testimony at trial is there any indication that the decedent intended her home to be transferred outside of the Trust.  Mr. Lanier testified as follows:[5]

> Q    Now, did Ms. Lockett tell you that she expected you and Mr. Pearce to operate this historic site?
>
> A    However we could do it.  To operate it?  Oh, absolutely not.
>
> Q    What did she expect?
>
> A    She wanted it to be designated, and the only way it could be designated and maintained as an historical site is for it to be turned over to

---

[5] At trial, respondent objected to admission of Mr. Lanier's testimony of the decedent's intentions concerning the Historic Site Language and the preservation of her home.  In any event, Mr. Lanier's testimony does not establish that petitioner is entitled to a charitable contribution deduction.

some authority that could handle that, certainly not a private arrangement.

Even if the Historic Site Language is read with Mr. Lanier's testimony as manifesting decedent's intention to transfer her home in order to preserve it as a historical site, the latitude given to the trustees in accomplishing this objective was wide. First, there is no charitable intent on the part of the decedent that is discernible from the language of the Trust or even from Mr. Lanier's testimony. Second, as respondent points out, there were various ways to preserve the decedent's home as a historic site, without transferring it to a qualifying charitable, educational, literary, or scientific organization. Specifically, respondent points out that an arrangement whereby a private party lived in the house and designated it as a historic landmark would have complied with the decedent's intentions, as she had expressed them to Mr. Lanier.[6]

Petitioner argues that United States v. Leonhardt, 37 AFTR 2d 76-1589, 76-1 USTC par. 13,138 (M.D. Fla. 1976), supports its entitlement to an estate tax deduction. In that case, decedent's will established a residuary trust, with the net income to be distributed to three named beneficiaries for life; following their deaths, the undistributed income and corpus were to be

_____

[6] The Secretary of the Interior approves the designation of properties as historical landmarks or their inclusion in the National Register of Historical Places, including properties that are privately owned and not owned by qualified charities. See National Historic Preservation Act, Pub. L. 89-665, sec. 101, 80 Stat. 915 (1966), 16 U.S.C. secs. 470 and 470a (1994).

distributed to not more than 10 charitable or educational institutions, to be selected by the trustee and the County Judge of Orange County, Florida.  The District Court upheld a charitable deduction under section 2055.

United States v. Leonhardt, supra, is distinguishable from the case at hand.  In Leonhardt, the decedent expressed an intent to transfer property exclusively to charitable organizations. The possibility that a charitable contribution would not become effective was deemed negligible.  In the present case, the trustees had discretion to transfer the property to an individual or to a noncharitable entity.  There was a more than merely negligible possibility that a charitable transfer would never occur.  The case at hand is more similar to the facts of Estate of Taylor v. Commissioner, supra, and Paris v. United States, supra, where the decedent's intentions to memorialize their relatives could be carried out without the transfer of property to, or the establishment of, a qualified charitable organization.

In short, we hold that petitioner is not entitled to a charitable deduction under section 2055, even though the trustees eventually transferred portions of the decedent's property to a qualified organization.  In light of the wide discretion afforded to the trustees, it was the trustees rather than the decedent who made the charitable transfer.  Because Messrs. Lanier and Pearce had the power to set aside decedent's home as a historic site without making a contribution to a qualifying organization, the

value of the transfer to a charitable entity was neither "presently ascertainable" at the date of decedent's death, nor was the possibility that the property would not be transferred to a qualifying organization so remote as to be negligible.[7]

2.    Deduction of Operating Expenses of the Cattle Ranch

Section 2053(a) allows a deduction for administration expenses in determining the value of the taxable estate.  Section 2053(b) allows a deduction for expenses of administering nonprobate property included in the gross estate if the expenses are paid prior to the expiration of the period of limitations for assessment under section 6501, and the expenses would be allowable under section 2053(a) if the property administered would have been probate property.  See Burrow Trust v. Commissioner, 39 T.C. 1080, 1087-1088 (1963), affd. 333 F.2d 66 (10th Cir. 1964).  Generally, the period of limitations for assessment is 3 years after the return is filed.  Sec. 6501(a). Where a taxpayer has filed a petition in this Court, the period of limitations is suspended from the time that the notice of deficiency is mailed until 60 days after the decision of this Court becomes final.  Sec. 6503(a)(1).

The cattle ranch business, which was transferred by decedent to the Trust during her lifetime, is nonprobate property that is

_____

[7] Petitioner also alleged in its petition that it was entitled to a deduct a loss for estate tax purposes on the portion of Basinger sold to the Water District.  Inasmuch as petitioner failed to address this issue at trial or on brief, we regard petitioner as having abandoned it.

included in the value of the gross estate.  Sec. 2036(a); see

Burrow Trust v. Commissioner, supra at 1087-1088.  Petitioner

filed the estate tax return on February 17, 1992.  Respondent

issued a notice of deficiency on February 3, 1995, and a petition

was timely filed on May 1, 1995, thereby suspending the period of

limitations for assessment.  All expenses of operating the cattle

ranch after decedent's death were therefore paid prior to the

expiration of the period of limitations for assessment under

section 6501.  See Rev. Rul. 61-59, 1961-1 C.B. 418; cf. Gillum

v. Commissioner, T.C. Memo. 1984-631.[8]  Consequently, the only

question remaining in determining whether the expenses are

deductible under section 2053(b) is whether they satisfy the

requirements of section 2053(a).

Section 2053(a) requires that the deduction be allowable by

the laws of the jurisdiction under which the estate is being

administered.  The relevant regulations further require that

deductions for administration expenses be "limited to such

expenses as are actually and necessarily incurred in the

administration of the decedent's estate".  Sec. 20.2053-3(a),

Estate Tax Regs.  This Court and the Court of Appeals for the

---

[8] Regardless of petitioner's having filed a petition in this Court, the period of limitations for assessment was also extended by petitioner's election under sec. 6166 to pay the estate tax in 10 equal installments.  Sec. 6503(d).  Under the election, the first installment was due on Feb. 17, 1997.  All the expenses of operating the cattle ranch were incurred between the date of decedent's death and Apr. 30, 1996.  The latter date was prior to the expiration of the period of limitations for assessment, as extended by the sec. 6166 election.

Eleventh Circuit, have recognized the validity of this regulation as imposing a Federal standard of necessity over and above the State requirement of allowability. See Marcus v. Dewitt, 704 F.2d 1227, 1229-1230 (11th Cir. 1983) (citing Pitner v. United States, 388 F.2d 651, 659 (5th Cir. 1967)); Estate of Posen v. Commissioner, 75 T.C. 355, 366 (1980).

The regulations consider the application of the phrase "actual and necessary expenses" to particular types of administration expenses. Expenses of preserving and distributing estate property are classified as miscellaneous expenses by section 20.2053-3(d)(2), Estate Tax Regs., which provides: "Expenses for selling property of the estate are deductible if the sale is necessary in order to pay the decedent's debts, expenses of administration, or taxes, to preserve the estate, or to effect distribution." See Marcus v. Dewitt, supra at 1229; Estate of Posen v. Commissioner, supra at 366-367, approving and applying the above regulation.

Respondent argues that the expenses of operation of the cattle ranch are not allowable as administration expenses under Florida law. The Circuit Court of Highlands County has not ruled whether the expenses are allowable under Florida law. Because Fishbranch and the assets of the cattle ranch were trust assets, not probate assets, the Circuit Court, in its capacity as a probate court, will probably never be asked to pass on their allowability under Florida law. Respondent acknowledges that

whether the expenses are allowable under Florida law requires a determination similar to the Federal test of necessity.  We therefore turn to the question of whether the expenses satisfy the Federal test of necessity to preserve the estate, as provided by section 20.2053-3(d)(2), Estate Tax Regs.

In certain circumstances, an estate's expenses of operating a business are regarded as necessary for the preservation of the estate and may therefore be deducted on the Federal estate tax return.  In Estate of Brewer v. Commissioner, a Memorandum Opinion of the Board of Tax Appeals dated Dec. 26, 1941, the estate owned a farm that raised cattle and chickens.  The executors decided that the best way to dispose of the farm was not to hold an auction sale but to sell the animals from time to time at the best prices they could obtain.  Judge Sternhagen relied on Adams v. Commissioner, 110 F.2d 578 (8th Cir. 1940), vacating and remanding a Memorandum Opinion of the Board of Tax Appeals dated Jan. 11, 1939, to hold that the expenses of continuing to operate the farm were necessary for the executors to make the most advantageous sales of the livestock and poultry. As such, the expenses were a "necessary incident of liquidation", and the deductions claimed for farm operations expenses were allowed.

In Adams v. Commissioner, supra, the estate consisted of real estate, mining leases, and mineral properties located in three different States.  After decedent's death, the estate

continued to engage in mining activities. The Court considered whether the expenses of carrying on mining activities were deductible as administration expenses. Because of the difficulty in ascertaining the nature of the assets in the estate, and because of the difficulty in expeditiously disposing of the bulk of the assets, the Court found that the expenses were incurred in connection with the protection or preservation of the estate.

We are convinced that the Trust's continuation of the ranching business was necessary for the preservation of the estate and was a necessary step in liquidating the estate's assets. The experts consulted by Messrs. Lanier and Pearce unanimously recommended that, in order to preserve value of the land, the cattle on the ranch not be sold. Mr. Malone, an employee of the Water District, which had no interest in the outcome of this issue, similarly testified that the Fishbranch land would be likely to revert to muck and swamp if the cattle grazing on it were sold. We also acknowledge the trustee's difficulty in disposing of Fishbranch after its lack of access was revealed, which further prevented its expeditious sale, and the fact that the value of the Fishbranch parcel remaining after the first Fishbranch sale, when the cattle finally were sold, did depreciate in value, as compared with the price obtained on the first Fishbranch sale. We therefore hold that the expenses

incurred in connection with the operation of the cattle ranch are deductible as administration expenses under section 2053.[9]

To reflect the foregoing and concessions,

<u>Decision will be entered</u>

<u>under Rule 155</u>.

---

[9] Consistent with respondent's argument that the expenses of operating the ranch are not deductible, respondent has also argued that the portion of legal fees and accounting fees paid to Mr. Lanier and an accounting firm that were attributable to the operation of the ranch are not deductible as administration expenses. Respondent's argument explicitly rests on the assumption that the expenses incurred in the operation of the cattle ranch, in general, are not deductible as administration expenses. Because we hold that the expenses incurred in the operation of the ranch are deductible as administration expenses under sec. 2053, the legal and accounting fees relating to the operation of the ranch are likewise deductible as administration expenses.